IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 22, 2017 Session

FILED
06/30/2017
Clerk of the
Appellate Courts

# IN RE MARIAH H.

**Appeal from the Juvenile Court for Johnson City**
**No. 46,694      Sharon M. Green, Judge**

_____

### No. E2016-02091-COA-R3-PT

_____

This is a termination of parental rights case involving the child, Mariah H. ("the Child"), who was one year of age at the time of trial. On June 26, 2015, the Johnson City Juvenile Court ("trial court") granted temporary legal custody of the Child to the Tennessee Department of Children's Services ("DCS"). The Child was immediately placed in foster care, where she has remained since that date. Following separate hearings, the trial court entered two orders adjudicating the Child dependent and neglected in the care of the parents: one on November 25, 2015, as to the mother, Teresa H. ("Mother"), and the second on January 13, 2016, as to the father, Stafford B. ("Father"). On February 2, 2016, DCS filed a petition to terminate the parental rights of Mother and Father.[1] Following a bench trial, the trial court terminated Father's parental rights to the Child after determining by clear and convincing evidence that Father willfully failed to visit the Child during the four months prior to the filing of the termination petition. Furthermore, the trial court dismissed the grounds alleged against Father of failure to establish paternity and persistence of the conditions leading to removal. Also finding clear and convincing evidence that termination of Father's parental rights was in the best interest of the Child, the trial court terminated Father's parental rights to the Child. Father has appealed. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

---

[1] Mother is not a party to this appeal. In the termination petition, DCS requested termination of both Mother's and Father's parental rights; however, termination of Mother's parental rights was addressed by separate order. The trial court noted Mother's express intent to surrender her parental rights at the June 19, 2016 hearing and set a later trial date to address that matter. The trial court certified its September 6, 2016 order terminating Father's parental rights as a final order pursuant to Tennessee Rule of Civil Procedure 54.02.

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and CHARLES D. SUSANO, JR., J., joined.

Cameron L. Hyder, Elizabethton, Tennessee, for the appellant, Stafford B.

Herbert H. Slatery, III, Attorney General and Reporter, and Brian A. Pierce, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I.  Factual and Procedural Background

The Child was born in June 2015 in Sullivan County, Tennessee to Mother.  The Child's birth certificate was silent as to the identity of her father.  Only days after the Child's birth, DCS, responding to a referral involving child abuse, filed a petition for temporary emergency custody of the Child.  The trial court subsequently ordered that the Child be placed into DCS custody on June 26, 2015.  At the time of removal, Mother stated to DCS that she believed Father to be the Child's biological father but did not know his whereabouts.  According to Mother, she had informed Father that he was the biological father of the Child in approximately March or April of 2015.  Father claimed that he only learned of the Child's existence in June 2015, a couple of weeks before her birth.  According to Father, he moved to Georgia from Tennessee in March or April of 2015.

Concomitant with the petition for emergency custody, DCS filed a motion requesting relief from the requirement of providing assistance to Father citing a previous involuntary termination of Father's parental rights to a sibling of the Child, J.H.  In the previous order terminating Father's parental rights to J.H., the trial court found clear and convincing evidence of three grounds for termination, including a finding that Father had abandoned J.H. by failing to visit him in the four months prior to the termination petition's filing.  In part because the trial court determined that J.H. and Father were "complete strangers," the trial court determined that it was in J.H.'s best interest for Father's parental rights to be terminated.

Following the Child's placement in DCS custody, the trial court conducted a preliminary hearing on July 9, 2015, during which Mother identified Father to the trial court as the biological father of the Child.  In an order entered on December 16, 2015, the court found that the Child was "dependent and neglected as to the mother" and that Mother had "perpetrated 'severe child abuse' upon [the Child]."  On January 13, 2016, the court further found the Child to be "dependent and neglected as to [Father]."  The court specifically found that "[Father] has not visited with the child at all" and "[Father]

2

has no relationship with the child at this time and is, in effect, a complete stranger to the child." Following that hearing, the court ordered that the Child remain in the custody of DCS. The court further ordered that if Father desired to visit the Child, he should contact DCS to schedule the visit. Additionally, the court granted DCS's motion and relieved DCS of making reasonable efforts to reunify the Child with Father due to the previous involuntary termination of his parental rights to J.H. On February 2, 2016, DCS filed a petition to terminate Father's parental rights. The trial court conducted a bench trial on June 19, 2016.

The testimony at trial established that Katie Wilhoit was assigned as the DCS case manager. Despite having been relieved of making reasonable efforts to reunify Father with the Child, DCS continued to encourage Father to develop a relationship with the Child following the Child's removal into DCS custody. Ms. Wilhoit testified that she immediately began trying to contact Father and was eventually provided his telephone number by Mother. She was subsequently able to contact Father on July 23, 2015. According to Ms. Wilhoit, she learned during this telephone conversation that Father had relocated from Elizabethton, Tennessee, to Augusta, Georgia, in March or April of 2015. Ms. Wilhoit testified that she informed Father of the importance of visiting the Child and remaining in contact with DCS during that phone conversation. At that time, Ms. Wilhoit obtained Father's mailing address to assist in furthering communication between Father and DCS.

Ms. Wilhoit reported that she contacted Father via telephone again on July 27, 2015, at which time they discussed a permanency plan, DNA testing, and the importance of Father's visiting the Child. According to Ms. Wilhoit, she subsequently mailed Father several documents, including information regarding a child and family team meeting. Ms. Wilhoit spoke with Father on August 3, 2015, via telephone, when she again stressed the importance of Father's visiting and forming a relationship with the Child. During their telephone conversation, Father informed Ms. Wilhoit that he was having a difficult time visiting the Child because of the distance and his lack of a vehicle and driver's license.[2]

On August 14, 2015, Ms. Wilhoit mailed to Father documents regarding the criteria and procedures for termination of parental rights, which Father acknowledged having received during a telephone conversation with Ms. Wilhoit on August 24, 2015. Ms. Wilhoit testified that during the August 24, 2015 conversation, she again stressed the importance of Father's visiting the Child. Father did not schedule a visit at that time.

---

[2] Both Ms. Wilhoit and Father explained to the trial court that Father's license had been suspended for failure to pay child support.

3

According to Ms. Wilhoit, she also assisted Father by scheduling an appointment for him to complete DNA testing in Georgia, but Father missed the appointment. In lieu of scheduling another appointment, DCS had a DNA test performed in approximately September 2015, using a DNA sample that Father had previously provided for a DNA test regarding another child. It is undisputed that the DNA test results were conclusive that Father was in fact the biological father of the Child. Ms. Wilhoit testified that she maintained contact with Father and continued to inform him of the significance of visiting the Child and of the consequences of his failure to visit.

Over the course of the dependency and neglect proceedings, Father informed Ms. Wilhoit and the trial court that factors such as the Child's not being placed with Father's family and Father's inadequate finances were preventing him from seeing the Child. During trial, Father testified that he had maintained employment with FPL Foods since approximately August 2015. The adjudicatory order reflects Father's prior testimony regarding his employment:

> [Father] testified that he has not paid any support for the child at all. He testified that he has a good paying job. He testified that he makes approximately ten dollars ($10.00) per hour at this current job, and that he works approximately ten (10) hours a day, six (6) days a week. He has been employed at this job since September 2015. He is paid "time and a half" for all hours over 40 hours each week.

According to Father's testimony, he would have been more easily able to visit with the Child if the Child had been placed with his family members. Ms. Wilhoit testified that she attempted to arrange visitation for the Child's paternal grandmother after the DNA testing had been conducted. Ms. Wilhoit explained that the paternal grandmother did not appear for the visit and that she never heard from the paternal grandmother again.

According to Ms. Wilhoit, Father repeatedly expressed to her that his employment with FPL Foods prevented him from visiting with the Child because of the company's strict attendance policy. When asked at trial why he did not travel to Tennessee to visit the Child, Father stated:

> At the time, I was getting employed at that position. The rules and regulations stated how long you have to work before you are able to even get a day off. Then it also states that you have to wait a year before you can have vacation leave, vacation pay. The total turnover at my job is just phenomenal. People come and go every day, and they are replaced every day. If it was a situation where I didn't have to have a job because of my

4

responsibilities with my kids, and I could possibly take a day off and get fired like the other people.

Father provided Ms. Wilhoit with FPL Food's employment policy, which was ultimately entered as an exhibit at trial. The employment policy provided in pertinent part:

The Company understands there may be a need to have time off for urgent personal reasons. In those instances, a RTO-Request may be submitted. The approval of these requests will be up to the Department Manager's discretion. No points will be issue[d] for the scheduled absence. The form must be turned in twenty-four (24) hours before the absence is to occur in order to be considered. A maximum of one (1) request may be approved per rolling 90 day period; no requests may be accrued to give additional time during later months.

Father testified that he had submitted "three or four" or "four or five" requests for time off to visit the Child. Father claimed, however, that his requests were denied each time due to his lack of seniority. The employment policy also allowed an employee to request time off for court dates. Father testified that he requested time off work for a "few" court dates.

Ms. Wilhoit testified that following Father's complaints regarding his work schedule, she had informed Father that they could schedule his visits with the Child on weekends or evenings so long as Father provided Ms. Wilhoit with prior notice of two or three days. Father testified, however, that no visitation was offered to him on weekends. After the termination petition was filed, Father attempted to visit with the Child once on the weekend of Memorial Day in 2016. Due to prior travel plans, Ms. Wilhoit was unable to supervise a visit on that weekend. According to Ms. Wilhoit, the foster parents were not willing to supervise that visit because they had never met Father.

Father visited the Child one time during the pendency of the case on June 20, 2016, for approximately two hours. Ms. Wilhoit supervised the visit between Father and the Child. According to Ms. Wilhoit, the Child was initially upset during the visit because of "the child not knowing who [Father was]," but the Child subsequently calmed down. During the visit, Father played with the Child and talked appropriately to her the entire time. At the conclusion of the visit, Ms. Wilhoit offered to schedule a "follow-up visit" with Father and the Child. However, Father did not schedule a subsequent visit and had not visited the Child since June 2016.

5

During trial, Father indicated that he had five children. According to Father, he did not have custody of any of his children. Father's parental rights to one child had been terminated. Father reported that he only paid child support through the court system for two of his other children. Father testified regarding a recent warrant for his arrest in Tennessee for statutory rape involving Mother. According to Father, he "went and took care of the warrant" a couple of weeks prior to trial around the same time he came to visit the Child. Father's court date concerning the related criminal charge was scheduled for July 19, 2016.

Ms. Wilhoit testified that the Child was doing well in her foster care placement and that she had observed the Child as "part of the family unit" in the foster home. The Child had been placed with two of her biological half-siblings. According to Ms. Wilhoit, the foster family intended to adopt the Child if she were to become available for adoption. Mother testified that if the Child could not be with her, she desired for the Child to remain in foster care with the Child's two half-siblings.

Following trial, the trial court entered a judgment on September 6, 2016, terminating Father's parental rights to the Child.[3] The court found by clear and convincing evidence that Father had abandoned the Child by willfully failing to visit her. The trial court dismissed the grounds of failure to establish paternity and persistence of the conditions leading to removal. The court further found by clear and convincing evidence that termination of Father's parental rights was in the best interest of the Child. Father timely appealed.

## II. Issues Presented

Father presents two issues for our review, which we have restated as follows:

1.    Whether the trial court erred by finding clear and convincing evidence that Father abandoned the Child by willfully failing to visit her for four months preceding the filing of the termination petition.

2.    Whether the trial court erred by finding clear and convincing evidence that it was in the Child's best interest to terminate Father's parental rights.

## III. Standard of Review

---

[3] Although DCS had pled the ground of abandonment for failure to support the Child in its petition, the trial court did not address that ground in its order terminating Father's parental rights.

6

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *see In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has recently explained:

> The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decison terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or

7

substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

* * *

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

## IV. Abandonment by Willful Failure to Visit

Father asserts that the trial court erred by terminating his parental rights based on the ground of abandonment by willful failure to visit. Upon a thorough review of the record, we disagree and conclude that the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence. Tennessee Code Annotated § 36-1-113 (Supp. 2016) lists the statutory grounds for the termination of parental rights, providing in relevant part:

(a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4. All pleadings and records filed in the chancery and circuit courts pursuant to this section shall be placed under seal and shall not be subject to public disclosure, in the same manner as those filed in juvenile court, unless otherwise provided by court order.

* * *

(c)     Termination of parental or guardianship rights must be based upon:
(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
(2)     That termination of the parent's or guardian's rights is in the best interests of the child.

Tennessee Code Annotated § 36-1-113(g)(1) authorizes termination of parental rights when:

Abandonment by the parent or guardian, as defined in section 36-1-102, has occurred . . . .

Tennessee Code Annotated § 36-1-102(1)(A)(i) (Supp. 2016) defines abandonment, in relevant part, as:

For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child . . . .

Pursuant to the statute, the court must find that a parent's failure to visit or support was willful. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007).  As this Court previously has explained:

The concept of "willfulness" is at the core of the statutory definition of abandonment.  A parent cannot be found to have abandoned a child under Tenn. Code Ann. section 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months.

*In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005).

Failure to visit or support a child is willful when a person is "aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id.* at 864.  This Court has further explained:

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*Id.* Furthermore, "[a] parent cannot be said to have abandoned a child when his failure to visit . . . is due to circumstances outside his control." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (citing *In re Adoption of A.M.H.*, 215 S.W3d at 810). A parent's failure to visit is not excused by someone else's conduct unless the conduct actually prevents the obligated person from visiting or "amounts to a significant restraint of or interference with the parent's efforts to develop a relationship with a child." *Id.* at 863-64. Lastly, any efforts made to visit a child after DCS files a petition to terminate parental rights do not negate or provide repentance for prior abandonment. *See* Tenn. Code Ann. § 36-1-102(1)(F); *In re S.R.M.*, E2008-01359-COA-R3-PT, 2009 WL 837715, at *12 (Tenn. Ct. App. Mar. 27, 2009).

In the present case, the trial court in its final judgment found as follows regarding the ground of abandonment by willfully failing to visit the Child:

> [Mother] testified during these proceedings that she had informed [Father] that he was the father of the child in March or April, 2015. [Father] acknowledged to the DCS family service worker that the mother had told him about her pregnancy prior to the birth of the child but denied that it was in March or April. The testimony of [Mother] is found to be more credible on the issue of when she advised [Father] that he was the father of her child.
>
> * * *
>
> The child was adjudicated a dependent and neglected child as to [Father] on January 13, 2016, by clear and convincing evidence. [Father] participated by telephone at the adjudicatory hearing at his request. As recited in the Order from the father's adjudicatory hearing, the Court found that [Father] had not visited with the child at all, even though the child was almost seven (7) months old at the time. The Court found that [Father] did not have any relationship with the child and was, in effect, a complete stranger to the child.
>
> * * *

10

[Father] had not paid any support for the child as of his adjudicatory hearing although he had a good paying job, made approximately ten ($10.00) dollars an hour, and worked approximately ten (10) hours a day, six (6) days a week. He was paid "time and a half" for all hours over 40 hours each week. This was previously found by the Court in the father's adjudicatory hearing based upon his testimony.

* * *

In its Order from January 13, 2016, the Court found that "[Father's] behaviors toward the minor child at issue in this cause are reminiscent of his behaviors when his other minor child, [J.H.], was removed into DCS custody for foster care. These behaviors include issues of failure to visit, failure to support, instability, and lack of a relationship with said child. As a result of [Father's] inaction in that case, his parental rights to the child, [J.H.], were involuntarily terminated."

* * *

The DCS family service worker later obtained a telephone number for [Father] from the mother and contacted him by telephone on July 23, 2015. During the telephone conversation, he provided his mailing address[.] The family service worker stressed to him the importance of maintaining contact with her and spoke to him about visiting the child. . . .

The DCS family service worker had a second conversation with [Father] four days later on July 27, 2015, during which they discussed him having visits with the child. He filed a copy of the Child and Family Team Meeting Summary dated July 27, 2015 (in which he participated by telephone) as an attachment to his Response to the Petition to Terminate Parental Rights. The Child and Family Team Meeting Summary stated that "FSW told the father he could visit before DNA, just give a couple days' notice of coming into town." In the section under "visitation plans for the next three months" the Child and Family Team Meeting Summary stated: "Visits have been offered to father. He lives in GA. Father states he has issues getting up to TN. States his job will interfere." Father was not employed by his current employer in July and was doing "sheet rock" work.

The DCS family service worker had a third conversation with [Father] a week later on August 3, 2015, in which they discussed him

11

visiting with the child to create a relationship with her.  She stressed to him the importance of the visits.

Ms. Wilhoit mailed [Father] a copy of the criteria and procedures for termination of parental rights on August 14, 2015, to the address he had provided to her.  He acknowledged to her that he had received the document.

During a telephone conversation with [Father] on August 24, 2015, Ms. Wilhoit discussed how important visiting with the child was.

* * *

During a telephone conversation with [Father] on September 8, 2015, Ms. Wilhoit stressed the importance of him visiting with the child.

* * *

[Father] told Ms. Wilhoit that his failure to visit with the child was due to his work schedule not permitting him time off to visit.  He gave this excuse at the time of the initial Child and Family Team meeting when he was doing sheet rock work, even before he had obtained his current job and continued to use this excuse.

A visit with the child and [Father's] mother had been scheduled through the DCS family service worker in December, 2015, but the paternal grandmother did not attend the visit.  She left the DCS family service worker a message on her voice mail stating that her husband was on dialysis three times a week, and that she did not have a ride.  Ms. Wilhoit did not ever hear from the grandmother again about scheduling another visit.

In January, 2016, Ms. Wilhoit again discussed with [Father] the importance of visiting with the child and, again, discussed the definition of abandonment for willful failure to visit.

Ms. Wilhoit attempted to accommodate the father's work schedule by offering to schedule visits with the father later in the evenings and on weekends.  Her testimony on her offers to try to accommodate the father's schedule is credible.

12

Ms. Wilhoit continued to urge the father to visit with the child in February, March, April, May, and June, 2016.

The testimony of Ms. Wilhoit that she encouraged [Father] to visit with the child during every conversation she had with him and that she stressed the importance of his visiting with the child during every conversation she had with him beginning in July, 2015, and extending through June, 2016, is credible.

The testimony of Ms. Wilhoit as to her advising [Father] on multiple occasions that his parental rights could be terminated on the basis of abandonment if he failed to visit with the child is credible.

The Department of Children's Services filed its Petition to Terminate Parental Rights on February 2, 2016. The four consecutive months immediately preceding the filing of the petition was October 2, 2015, until February 1, 2016.

[Father] did not visit or even request a visit with the child between October 2, 2015, and February 1, 2016.

[Father] did not request a visit with the child for more than three (3) months after the Petition to terminate his parental rights had been filed.

[Father] made his first request to visit with the child during the week [preceding] the Memorial Day weekend, 2016. The DCS family service worker was not able to accommodate his request for a visit during the Memorial Day weekend due to her previous plans to be out of town for the holiday weekend. [Father] subsequently requested a visit on June 20, 2016, which was arranged by DCS and which he attended.

[Father's] testimony that he had requested other weekend visits is not credible. [Father] has not requested another visit with the child since the solitary visit on June 20, 2016.

[Father] has family members in Georgia, and, according to his testimony, they have homes with pools. He offered no valid explanation why he did not seek assistance from them in coming to Tennessee to visit with his child.

Even after DCS was relieved of making reasonable efforts for reunification on January 13, 2016, Ms. Wilhoit continued to try to contact the father, continued to urge him to visit with the child, and continued to keep him informed about what was going on with the child.

The father's parental rights had been terminated on July 10, 2012, in regard to another child for abandonment for his willful failure to visit with the child for a period of four (4) consecutive months immediately preceding the filing of the Petition seeking to terminate his parental rights. As in these proceedings, the father had participated in the underlying dependency and neglect proceedings by telephone while he was living out of state (New York at that time). The Court found in those proceedings that "[w]hile he lives in New York City and visitation would be difficult, the Court finds that it would not be impossible or overly burdensome if he had the desire to visit with his child." The father was, therefore, aware of his duty to visit his child and aware of the potential consequences for his failure to visit.

As found in regard to his other child, it would not be impossible or overly burdensome for [Father] to visit with the child if he had the desire. In this case, he is residing even closer to Johnson City than he was when his parental rights to his first child with [Mother] were terminated.

From the time of the father's adjudicatory hearing on January 13, 2016, until the hearing in these termination proceedings the only change in the conditions for removal that has occurred as to [Father] is that he has visited with the child one (1) time instead of no times. He still has no relationship with the child and is, in effect, a complete stranger to the child.

At trial, the father explained that "finances" kept him from visiting with the child even though the Court found on January 13, 2016, that [Father] had been employed since late October, 2015, making $10.00/hour, working 6 days a week, 10 hours a day, with overtime of time and a half for all hours in excess of 40 hours/week. [Father's] testimony that his "finances" kept him from visiting is not credible.

[Father] acknowledged that, during a hearing, the Court urged him to have face to face meetings with the child. He acknowledged that he knew that his parental rights could be terminated if he did not visit with the child.

[Father] furnished the Court with a copy of his employer's policy which states that the employer "understands that there may be a need to

have time off for urgent personal reasons. In these instances, an RTO request may be submitted. The approval of these requests will be up to the department manager's discretion. No points will be issued for the scheduled absence. The forms must be turned in 24 hours before the absence is to occur in order[] to be considered."

The employer's policy also stated that the employee could request time off for court appearances.

There is no credible evidence that the father ever submitted a request to have time off "for urgent personal reasons" or for a court appearance, prior to his appearance today. The father's testimony on cross examination that he submitted "three or four" or "four or five" requests for time off is not credible.

* * *

Less than one month following the child's being placed in the custody of DCS, the family service worker made telephone contact with [Father], discussed the child being in the custody of the Department, and began encouraging him to visit with the child. During every contact the family service worker had with [Father], she encouraged him to visit with the child and stressed to him the importance of visiting with the child. [Father] acknowledged that the Court also urged him to visit with the child. [Father] was aware that his parental rights could be terminated on the basis of abandonment for his willful failure to visit, due to his parental rights to a sibling of this child having been terminated in part for his abandonment of that child for failure to visit. In addition, the family service worker advised him of the criteria for termination of parental rights, including his willful failure to visit for four consecutive months.

In July, 2015, [Father] was doing sheet rock work in Georgia and used his work schedule as the excuse why visiting with the child would be difficult. After October, 2015, he obtained different employment and again used his work schedule as the excuse why he could not visit. The employer's work policy presented by [Father] specifically contained provisions for an employee requesting time off for "urgent personal reasons." The Court finds that [Father's] testimony that he requested time off for the purpose of visiting his child on multiple times and that they were all denied is not credible.

15

During trial, [Father] testified that finances had been the reason he did not visit although he had been gainfully employed on a full time basis, with overtime pay on a regular basis, since October, 2015. The Court finds that [Father's] excuses for not visiting for financial reasons were not credible.

The Court finds that the Department of Children's Services attempted to accommodate [Father] in visiting with the child after normal work hours and on weekends and that he did not request a visit with the child until late May, 2016, more than three (3) months after the petition to terminate his parental rights had been filed. His first visit with the child occurred on June 20, 2016, and he has not requested another visit since then.

During the four (4) consecutive months immediately preceding the filing of the petition, there was an outstanding attachment for [Father] due to pending criminal charges against him. The Court can reasonably infer that the outstanding attachment was the basis for [Father's] not traveling to Tennessee to visit with his child, more than finances or his work schedule.

The Court of Appeals has previously held that a parent's failure to visit may be willful when the parent voluntarily leaves the jurisdiction. *In re D.M.S., G.H.S., and T.M.S.*, 2005 WL 1887526 (Tenn. Ct. App. [Apr. 4,] 2005). The Court can reasonably infer that [Father's] leaving east Tennessee in March or April, 2015, on a Greyhound bus, with no employment in Georgia, no home in Georgia, and in such financial straits that he had to apply for "assistance" in the State of Georgia created a situation of his own design and created willfulness in creating the circumstances which led to his failure to visit. [Father] was residing in the State of Georgia, adjoining the State of Tennessee. Although it may have been more difficult for him to visit than if he had continued to reside in Elizabethton, it certainly was possible.

[Father] has also testified that without his job he would not have been able to obtain custody of his child. It is true that having a legal source of income is a consideration for the Court in determining a parent's ability to provide care for a child, but a child is not a piece of furniture which is placed in storage for over a year until one is ready to move it into the home. The Court takes judicial notice of the fact that a baby has significant physical and emotional needs which must be met on a daily basis, twenty-four hours each day, and that attachments are formed with the persons who

16

meet those needs. As of the date of the hearing on the Department's petition, the child has been in the care of the foster parents for thirteen months, where [her] physical and emotional needs have been met daily. In comparison, the child has been in the supervised care of [Father] for two hours, during a solitary supervised visitation on June 20, 2016.

The Court finds that the statutory ground of abandonment by willful failure to visit for four (4) consecutive months immediately preceding the filing of the petition to terminate the parental rights of [Father] has been proven by clear and convincing evidence.

(Paragraph numbering omitted.) Based on the above facts, the trial court therefore found by clear and convincing evidence that Father had willfully failed to visit the Child during the determinative four-month period immediately preceding the filing of the termination petition. We agree. We note that although we review the trial court's findings of fact with a presumption of correctness, the trial court's conclusion that Father's failure to visit constituted willful abandonment is a question of law, which we review *de novo* with no presumption of correctness. *See In re Adoption of A.M.H.*, 215 S.W.3d at 810.

Testimony demonstrated that throughout the time the Child had been in DCS custody, Ms. Wilhoit repeatedly informed Father that he needed to visit the Child and informed him that the consequences could be termination of his parental rights if he failed to do so. Additionally, Ms. Wilhoit provided Father with a copy of the criteria and procedures for termination of parental rights, which Father acknowledged receiving. At trial, Father admitted that he previously knew the possible consequences of his failure to visit the Child during the relevant four-month period.

The trial court correctly determined that the statutorily determinative period spanned from October 2, 2015, through February 1, 2015 ("determinative period"). The record reflects that Father did not visit and made no attempt to visit the Child within the determinative period. Only after the termination petition was filed did Father request visitation with the Child. The first time Father made an effort to visit the Child was in May 2016, over Memorial Day Weekend, which was after DCS filed the petition to terminate Father's parental rights. Ms. Wilhoit was unable to accommodate a visit on that date due to previous travel plans. Father subsequently requested a visit in June 2016. The only time Father actually visited the Child was on June 20, 2016, almost five months after the termination petition was filed. That visit lasted approximately two hours. At trial, Father acknowledged that he had only visited the Child once. We note that a parent's abandonment of his or her child "may not be repented of" by the parent's efforts to visit the child after a termination petition is filed. *See* Tenn. Code Ann. § 36-1-102(1)(F).

17

Father does not dispute that he failed to visit the Child during the determinative period. He instead argues that the trial court erred in finding that his failure to visit was willful, insisting that his failure to visit was due in part to his demanding work schedule and his employer's strict attendance policy. We emphasize that a parent's failure to visit "is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child[.]" *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005) (citations omitted).

Despite Ms. Wilhoit's encouragement for Father to visit the Child, Father repeatedly declined offers for visitation by claiming that he was unable to visit due to his demanding work schedule. Consequently, Ms. Wilhoit offered Father visits that would have occurred on evenings and weekends to accommodate his work schedule. The trial court found Ms. Wilhoit's testimony credible regarding her offer to accommodate Father's schedule and provide weekend visitation for Father. We further emphasize that the trial court's determinations regarding witness credibility are afforded great weight on appeal. *See Jones*, 92 S.W.3d at 838. Despite Ms. Wilhoit's offer to provide Father with visitation on weekends and evenings, Father presented no evidence that he attempted to visit the Child or develop any kind of relationship with her for the first several months of her life. Only months after the termination petition was filed did Father visit with the Child one time for approximately two hours. We determine Father's argument that he was prevented from visiting with the Child due to his work schedule to be unavailing.

Additionally, Father posits that his failure to visit was not willful due to his lack of a driver's license and lack of financial resources to travel from Georgia to Tennessee for the visits. In *In re DMD*, No. W2003-00987-COA-R3-PT, 2004 WL 1359046 (Tenn. Ct. App. June 17, 2004), a parent similarly argued that her financial situation had prevented her from visiting her child. In that case, this Court determined:

> We are not insensitive to Mother's financial difficulties, and mere poverty is not grounds for termination of parental rights. However, it is undisputed that Mother made absolutely no attempt to maintain a relationship with [the children] for nearly a year. [I]t is undisputed that Mother failed to visit, telephone, send small gifts or cards, or in anyway maintain contact with these children.

*Id.* at *5. This Court in *DMD* reversed the trial court's denial of the abandonment ground, determining that clear and convincing evidence existed to support a finding that

the mother "willfully failed to visit, contact, or in any way fulfill parental duties toward [the children] for nearly a year." *Id.*

Although "mere poverty" is not a reason or ground to terminate a parent's parental rights, *see id.*, in the case at bar, Father made no efforts within his financial means to contact the Child, visit the Child, or develop any relationship with her for nearly a year following her birth. Father made his first attempt to visit the Child months after the termination petition was filed. The trial court found that Father's testimony that his "finances" prevented him from visiting the Child was not credible. Contrary to Father's argument, Father testified in January 2016 during his adjudicatory hearing that he had a "good paying job," for which he earned approximately ten dollars per hour working ten hours a day and six days a week, plus "time and a half" for any overtime worked. Father maintained this employment until the termination trial in July 2016. Because Father was gainfully employed and made no efforts to maintain a relationship with the Child, we determine Father's argument that his failure to visit was not willful due to his limited financial resources and his lack of a driver's license to be unavailing.

Father further asserted that he could have more easily visited with the Child if the Child were placed with his family members in closer proximity to him. We note that Ms. Wilhoit attempted to schedule visitation with the paternal grandmother; however, the grandmother cancelled and failed to reschedule the visit. Father presented no evidence that any of his relatives had filed a petition seeking custody or were willing to accept custody of the Child. Upon a thorough review of the record, we conclude that the evidence preponderates in favor of the trial court's determination, by clear and convincing evidence, that Father abandoned the Child by willfully failing to visit her during the four months preceding the filing of the termination petition.

V. Best Interest of the Child

Father contends that the trial court erred by finding clear and convincing evidence that termination of his parental rights was in the best interest of the Child. Upon a thorough review of the record, we disagree. We conclude that the trial court's determination in this regard is supported by clear and convincing evidence.

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *See In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 (Tenn. 2016) ("'The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.'") (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010)). Tennessee Code Annotated § 36-1-113(i) provides a

list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as

20

may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)  Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)  Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As this Court has explained:

Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S.W.3d at 878.

In its final judgment, the trial court provided the following findings of fact regarding the best interest analysis in addition to the previously stated findings regarding Father's failure to visit the Child:

The [Child] was placed in the temporary custody of the Tennessee Department of Children's Services on June 26, 2015, when she was two (2) days old. The child was born drug-exposed to cocaine. The child has been in the custody of the Department of Children's Services continually since June 26, 2015, a period of almost one (1) year as of the date of this hearing.

* * *

[Father] did not pay any prenatal expenses for the child to the mother and did not provide any support to the mother prior to the child's birth. This was a previous finding of the Court in the father's adjudicatory hearing based upon his testimony.

21

[Father] had not paid any support for the child as of his adjudicatory hearing although he had a good paying job, made approximately ten ($10.00) dollars an hour, and worked approximately ten (10) hours a day, six (6) days a week. He was paid "time and a half" for all hours over 40 hours each week. This was previously found by the Court in the father's adjudicatory hearing based upon his testimony.

* * *

The biological parentage of [Father] as the father of the child was confirmed by DNA testing. His testimony that it took four months for the DNA testing to be scheduled was not credible. The testimony of the DCS family service worker that it had been scheduled in August but missed by [Father] was credible.

* * *

The father has not made any payments of child support for the child since she was born.

[Father] has not presented any evidence that he is able to assume custody of the child. He has not provided any evidence of his living conditions. His means of transportation is a bicycle, his driver's license has been suspended, and there is no evidence that he has any way to provide transportation for the child. He has not provided any evidence of his child care plans to provide care for the child for the extensive hours he works if he were to obtain custody. He has not provided any evidence that he has inquired with pediatricians in order to arrange medical treatment for the child. His testimony appeared to focus on his opinion that it would be easier for him to visit with the child if one of his family members had custody. The record does not contain any evidence that any of his relatives have ever filed a petition for custody of the child or even contacted the Department of Children's Services, with the exception of his mother who requested the one visit which she failed to attend.

[Father] never filed a petition to establish parentage of the child after the mother told him that he was the father of the child or after DNA testing results were received.

The child has been placed in a DCS foster home with two of her half-siblings since she was two (2) days old. It is a two parent home and

22

she is doing well. She is a part of the family unit in her foster home. The foster parents are the care givers for the child and their home is the only home she has known. If she were to become available for adoption, the foster parents are willing to adopt her.

The preference of [Mother] would be that if the child could not live with her, she would want her to live "with her [the Child's] sisters" in the foster home where she has resided since her discharge from the hospital following her birth.

[Father] has been indicated by the Department of Children's Services for sexual abuse of a minor ([Mother]). He had an outstanding warrant for his arrest in Tennessee throughout the dependency and neglect proceedings for the statutory rape of [Mother] and during the hearing on January 13, 2016, acknowledged that there was an outstanding warrant for his arrest. The criminal proceedings are still pending at the time of this trial, although [Father] testified that he "took care of the warrant" in June, 2016, when he was in town for his one visit with [the Child].

The father acknowledged that he has other children who he does not have custody of, two in New York, and one in Maine. His testimony was that he paid child support on his sons but not his daughters.

Father acknowledged that he has a criminal record.

Father acknowledged that he did not have a relationship with the child.

* * *

The Court has examined the evidence in considering the non-exhaustive factors set out in Tennessee Code Annotated, § 36-1-113(i), as well as other factors, in determining whether it is in the best interests of the [Child], for the parental rights of [Father] to be terminated. The Court finds that there is clear and convincing evidence that it is in the best interest of the minor child that [Father's] parental rights to the [Child], be terminated[.]

The Court finds that [Father] has not made changes in his conduct or circumstances that would make it safe for the child to go to his home. He has no parent-child relationship with the child and is, in effect, a stranger to

23

the child. This circumstance has not changed since the child was placed in the custody of DCS and DCS ha[d] its first contact with [Father] in July, 2015.

The Court finds that [Father] has not maintained regular visitation with the child. He has had only one visit with the child in the thirteen (13) months since the child was placed in the temporary custody of the Department of Children's Services although the child's family service worker encouraged [Father] to visit with the child and he was aware of the potential consequences of his failure to visit. He moved to an adjoining state at the time [Mother] advised him of her pregnancy. Although traveling to Johnson City may have been more cumbersome for the father from Georgia, it certainly was possible if he had truly wanted to establish a relationship with the child.

The Court finds that [Father] does not have a meaningful relationship with the child. [Father] has only had one visit with the child during her entire life and that the child is now thirteen (13) months old. He acknowledged that he did not have a meaningful relationship with the child during his testimony.

The Court finds that changing caregivers at this stage of the minor child's life would have a detrimental effect on her. Specifically, the Court finds that, at the time of this hearing, the minor child has been in foster care for thirteen (13) months, and has been in the same foster home since she was two (2) days old. The foster parents are her caregivers and she is part of their family unit. The half-siblings (maternal) of [the Child] reside in the same foster home with the minor child. The Court finds that [the Child] has a genuine attachment and bond with her foster family. The foster family is willing to adopt the child if she becomes available for adoption. The child's mother's desire is that, if the child cannot be placed with her, it is her desire that the child remain with "her sisters," the child's half-siblings. The Court finds that a change of caregivers, removal of the child from the foster home, and disruption of the bonds between the child and other foster family members would be detrimental to the child.

The Court finds that [Father] has not paid child support consistently.

The Court finds that [Father] has shown little or no interest in the welfare of the child. The proverbial "actions speak louder than words" come to mind in this case. [Father] may have spoken with the DCS family

24

service worker regularly, he did not even request to see the child until a holiday weekend when the child was eleven (11) months old, even though she had been in foster care since she was two (2) days old.

(Emphasis in original; paragraph numbering omitted.) Based on the foregoing findings, the trial court determined by clear and convincing evidence that terminating Father's parental rights was in the best interest of the Child. Having carefully considered the record in this cause, we agree with the trial court.

As the trial court found, several factors provided in Tennessee Code Annotated § 36-1-113(i) weigh in favor of the termination of Father's parental rights. Father has not made an adjustment of circumstance, conduct, or condition that would make it safe for the Child and in the Child's best interest to be placed in his home. Father has shown no ability or plan to care for the Child in his home. Despite urging from DCS that Father visit his Child, he has only visited for approximately two hours in her entire life. Due to Father's failure to visit the Child, Father is essentially a "complete stranger" to the Child, as the trial court found. Father admits to not having any meaningful relationship with the Child.

The trial court found that Father had shown little interest in the welfare of the Child. Father did keep in contact with DCS and attend a parenting assessment in Georgia; however, he failed to visit the Child to maintain a relationship with her. As the trial court also found, Father failed to pay child support consistently for the Child. Additionally, as of late June 2015, shortly before trial, Father had an outstanding warrant for his arrest due to charges of statutory rape involving the Child's mother. Those charges were still pending at the time of trial.

As the trial court further found, a change of caretakers would likely have an adverse effect on the Child. The Child has remained in the same foster home with two of her biological half-siblings since shortly after she was born. Based on observations from DCS, the court found that the Child is thriving in the care of her foster parents and that abruptly returning the Child to Father would be detrimental to the Child. The Child is bonded to the foster parents, who have expressed a desire to adopt her. Mother testified that if she were unable to obtain custody of the Child, she would want the Child to be with the Child's current foster parents and biological half-siblings. Upon a thorough review of the record, we conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that termination of Father's parental rights was in the Child's best interest.

## VI.  Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects, including the termination of Father's parental rights.  Costs are assessed to the appellant, Stafford B.  This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Father's parental rights and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE